* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. Defendant-employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Industrial Commission has jurisdiction over the parties and all parties have been properly named in this action.
3. An employer-employee relationship existed between plaintiff and defendant-employer on or about October 22, 2000.
4. The carrier on the risk at the time of the stipulated injury by accident was CNA Claim Plus.
5. Plaintiff earned a gross pay of $ 850.00 per week and $ 875.00 per month per diem for daily living expenses, which contemplated such costs as transportation, lodging, meals, etc.
6. The following were marked and received into evidence at the Deputy Commissioner's hearing as:
 a. Stipulated Exhibit 1 — Pre-Trial Agreement and Industrial Commission Forms 18, 19, 61, 33 and 33R
 b. Stipulated Exhibit 2 — Newspaper report dated November 16, 2000
 c. Stipulated Exhibit 3 — Automobile accident report dated October 22, 2000
 d. Stipulated Exhibit 4 — Information from employee benefit division dated December 21, 2000
 e. Stipulated Exhibit 5 — Plaintiff's medical records. *Page 3 
7. The issues before the Full Commission are whether plaintiff's injury arose out of and in the course of his employment with defendant-employer, and, if so, what benefits he is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on December 6, 1941 and was 61 years old at the time of the Deputy Commissioner's hearing.
2. Prior to graduating from high school, plaintiff entered the military and received a military service high school equivalency diploma while serving in the Army. Prior to his employment with defendant-employer, plaintiff worked in the field of mechanical electric heating installation and repair.
3. Plaintiff was employed as a sheet metal foreman for defendant-employer for approximately ten years. As part of his job duties, plaintiff supervised a crew of 20 to 25 men. He was responsible for directing his crew and ensuring the work was completed correctly.
4. As the sheet metal foreman for defendant-employer, plaintiff completed various projects throughout South Carolina, North Carolina, and other states. It was plaintiff's normal routine to temporarily relocate near the job when it was too far for him to commute from his permanent residence in Conway, South Carolina. Once the various projects were complete, plaintiff returned to his home in South Carolina.
5. In March 2000, defendant-employer began working as a subcontractor on a prison construction project in Winton, North Carolina. It was anticipated that it would take approximately one year to complete the project.
6. Plaintiff worked as the sheet metal foreman for the prison construction project in Winton, North Carolina. In this position, plaintiff was a salaried employee earning $ 850.00 per week. In addition to his salary, defendant-employer paid plaintiff an $ 875.00 a month per diem *Page 4 
for daily living expenses, including lodging, transportation, and meals. The monthly per diem, which included payment for travel, was made under the terms of the employment and as an incident to the contract of employment.
7. Because the prison construction project was located too far for plaintiff to commute from his home in South Carolina, he leased a mobile home near Winton, in Ahoskie, North Carolina. Plaintiff's wife remained at their permanent residence in South Carolina. On holidays and long weekends, plaintiff returned to his South Carolina residence. On the other weekends, his wife visited him in Ahoskie at his temporary residence. Additionally, plaintiff used his personal vehicle to travel to and from Ahoskie to the prison construction project in Winton.
8. During his time in Ahoskie, plaintiff became involved in a local church and had a program on a local Christian radio station. The Commission finds that plaintiff's involvement in local ministries does not establish that he considered himself to be a resident of Ahoskie, North Carolina.
9. Plaintiff used the per diem provided by defendant-employer to pay his mobile home lease and to pay for the fuel he used to commute to and from the prison construction site.
10. Plaintiff worked Sunday through Friday each week at the prison construction project. For religious reasons, plaintiff did not work on Saturdays. He traveled a regular route to the prison construction project, leaving Ahoskie between 5:00 a.m. and 6:00 a.m. each day.
11. On October 22, 2000, plaintiff left his temporary residence to travel to work in Winton. During the commute, plaintiff's personal vehicle ran out of gas. As a result, plaintiff left his vehicle on the side of the road and walked to a nearby gas station. However, the gas station was not open for business at that time. Plaintiff used the pay phone at the gas station to *Page 5 
call his wife, who was visiting him that weekend in Ahoskie. He requested she meet him with a gas can at another station. While returning to his vehicle, plaintiff was struck by an automobile. Plaintiff sustained severe injuries, including closed head injuries and fractures.
12. Plaintiff has not returned to work for defendant-employer or any other employer since the October 22, 2000 accident.
13. On October 22, 2000, plaintiff was an employee whose job involved traveling to the job sites where defendant-employer assigned him to work. Since plaintiff was working at a prison construction site in Winton, North Carolina, he was a traveling employee. Defendant-employer paid plaintiff a per diem allowance each month while he was working at the Winton construction site. During the ten years that plaintiff worked for defendant-employer, he was assigned to various projects in different states, which required him to travel and find lodging away from his permanent residence in South Carolina. Due to the nature of the job, plaintiff was required to find lodging near the construction site in order to be able to report for work on time in the mornings. Plaintiff's permanent residence was too far to commute daily to the prison construction project.
14. At the time of the accident on October 22, 2000, plaintiff was traveling to work from his temporary residence in Ahoskie. Commuting to work is an activity that a traveling employee would reasonably be expected to perform. Plaintiff was attempting to travel directly to defendant-employer's construction project when his vehicle ran out of gas. While walking back to his vehicle, plaintiff was struck by an automobile. Consequently, as a traveling employee commuting to and from the job site, plaintiff would have been placed at some risk of being involved in an automobile accident. The risk was incidental to his employment, which required him to travel back and forth from his temporary residence to the prison construction project. *Page 6 
Further, defendant-employer contemplated plaintiff's need to secure temporary housing and to commute by providing him with a per diem to cover the expenses of lodging and transportation while he worked on this particular project as part of the employment contract.
15. The Full Commission finds that it was an unusual occurrence for plaintiff to be struck by an automobile. As a traveling employee, plaintiff was in the course of his employment and the automobile accident arose out of his employment. Plaintiff was also in the course of his employment because he received a travel allowance under the terms of the employment and as incident to the contract of employment.
16. Following the accident, plaintiff was taken to the emergency room at Roanoke Chowan Hospital. Plaintiff suffered an open head injury to both the right and left forehead, as well as compound fractures to the right leg and left elbow. Due to the seriousness of plaintiff's injuries, including his non-responsive state and poor respiratory effort, plaintiff was transported by air to Pitt County Memorial Hospital.
17. At Pitt County Memorial Hospital, plaintiff came under the care of Dr. David W. Pearsall from his date of admission on October 22, 2000 to approximately November 10, 2000. Plaintiff was diagnosed with pneumocephalus, multiple hemorrhagic parenchymal contusion involving bilateral temporal lobes, left temporal fracture, fracture of the right lateral pterygoid plates, nasal bone fracture, right distal tibiofibular fracture, left iliac wing fracture, right fourth and fifth rib fractures, along with respiratory insufficiency and increased intracranial pressure, which was monitored by a bolt placed in his head.
18. As a result of his injuries and altered mental status, plaintiff remained under the care of a variety of specialists. Plaintiff underwent multiple procedures including left Swan-Ganz catheter, irrigation of an open right distal tibofibular fracture, ICP monitor by a bolt, open *Page 7 
reduction and internal fixation of right distal tibiofibular fracture, repair of left elbow laceration, repair of left temporal lacerations, repair of right lateral nose laceration, repair of anterior forehead laceration, IVC filter placement, tracheostomy esophagogastroscopy, and PEG tube placement.
19. At the time of plaintiff's discharge from Pitt County Memorial Hospital, his diagnoses included the following: pneumocephalus, multiple hemorrhagic parenchymal contusions involving bilateral temporal lobes, left temporal fractures, lateral right pterygoid fracture of the pterygoid plate, nasal bone fracture, right distal tibiofibular fracture, fracture of the left iliac wing, four through five right rib fractures, respiratory insufficiency, increase in cranial pressure secondary to cerebral edema, and phlebitis LUE. Plaintiff's neurological status remained limited because he was unable to follow commands with meaningful movement. Rehabilitation efforts would only be considered when plaintiff regained functioning. Plaintiff's prognosis was poor due to the fact that he had not had any meaningful neurological recovery. The medical providers thought that plaintiff would benefit from a long-term nursing facility.
20. From November 10, 2000 to approximately January 8, 2001, plaintiff was a patient at NextCare Specialty Hospital of North Carolina. While at NextCare Hospital, Dr. Gerrie M. Hand managed plaintiff's care, which included continued rehabilitation efforts in the form of physical and occupational therapy for his multiple fractures. During the course of his treatment, plaintiff made significant improvement. Plaintiff began to answer appropriately and spontaneously; however, he continued with fluctuating lucidity. Plaintiff was fitted with a specialty brace for the right lower extremity. On December 11, 2000, plaintiff underwent a decannulization of his tracheostomy without complications. Upon his discharge, plaintiff received the following diagnoses: status post closed head injury secondary to pedestrian motor *Page 8 
vehicle accident, status post multiple trauma, respiratory insufficiency, diabetes insipidus, diabetes mellitus, hypertension, seizure prophylaxis, pruritus and eosinophilia improving. After his release from NextCare, plaintiff was again transferred to Pitt County Memorial Hospital.
21. From January 9, 2001 to approximately February 8, 2001, Dr. Jacinta M. McElligott treated plaintiff during his second stay at Pitt County Memorial Hospital. Plaintiff's disabilities included decreased communication skills, decreased cognitive skills, decreased elimination skills, decreased eating skills, decreased safety awareness, decreased self-care skills and decreased participation.
22. As a result of his severe closed head injury, plaintiff received comprehensive inpatient rehabilitation including physical therapy, occupational therapy and recreational therapy. He also participated in speech language pathology to evaluate and treat cognitive defects as needed. On January 21, 2001, plaintiff underwent a cystoscopy due to urinary retention probably secondary to neurogenic bladder. The physicians at the hospital believed plaintiff's rehabilitation potential was fair to good.
23. At his discharge from Pitt County Memorial Hospital, his physicians recommended that plaintiff be supervised at a level 13, or full-time supervision with restraints. For assistance, it was required that plaintiff be provided with a 3-in-1 commode, a walker and a wheelchair for long distances. Within a few days of discharge, plaintiff continued to make strong gains, including the ability to sit on the tub and bathe himself, the ability to put on his pants, socks and shoes, the ability to groom himself at the sink and to stand and pull up his pants with 25% assistance, the ability to put on his shirt with setup assistance while sitting up in the wheelchair and at the edge of the bed. Plaintiff was able to stand and turn to sit on the chair with hands-on help. He was also able to concentrate and pay attention to a task in a non-distracting *Page 9 
room. Plaintiff was able to follow simple directions when they were repeated several times and could name common objects when given the first sound of the word. Plaintiff could only identify and participate in simple leisure interests including matching dominos or tossing a ball with 50% assistance and verbal reminders. At discharge, plaintiff was eating more than 50% of his meals, but required reminders to take small bites and to alternate between liquids and solids. It was important for plaintiff to eat in a quiet place to help him concentrate on eating. On February 8, 2001, plaintiff was discharged in stable condition to return home with his wife in South Carolina.
24. From February 13, 2001 to March 13, 2001, plaintiff received speech therapy from Georgetown Outpatient Therapy Center and Dal McDilda, CCC-SLP. Plaintiff could follow 1 and 2 part commands with objects. His short-term memory improved for repeating up to 3-word strings and 4-digit strings. Plaintiff often had to be redirected because his focused and sustained attention were inconsistent. Plaintiff rarely exhibited impulsivity during treatment sessions, but was consistently cooperative. Although plaintiff needed to continue with speech therapy services, his speech therapy at Georgetown Outpatient Therapy Center was terminated so he could receive services closer in proximity to his home.
25. On April 9, 2001, plaintiff returned to Eastern Neurosurgical and Spine Associates for further evaluation. Dr. Keith A. Tucci noted that plaintiff was awake, alert and conversant. Dr. Tucci further noted that plaintiff had some word-finding difficulties, but could name and repeat. Overall, Dr. Tucci was very happy with plaintiff's outcome and felt that his recovery was "miraculous."
26. Also on April 9, 2001, Dr. Bruce D. Wilhelmsen with Orthopaedics East evaluated plaintiff's right leg. Dr. Wilhelmsen instructed plaintiff to wear the leg brace only at *Page 10 
the discretion of the rehabilitation team. Dr. Wilhelmsen explained to plaintiff that the brace was not to be worn for fracture, stability or support.
27. By letters dated May 4, 2001 and November 15, 2001, Dr. McElligott reiterated plaintiff's diagnosis of closed-head injury secondary to a motor vehicle collision. Plaintiff was last seen in the traumatic brain injury rehabilitation outpatient clinic on April 10, 2001. Dr. McElligot noted a continued medical necessity for occupational, physical and speech therapy to maximize plaintiff's functional ability at home and at the community level, and to remedy the severe cognitive, communicative and functional mobility deficits associated with plaintiff's major trauma.
28. Beginning February 16, 2001, Dr. Cornelius L. Alston at Horry Medical Associates began monitoring plaintiff for his closed-head injury, as well as a variety of other related medical problems. On November 28, 2001, Dr. Alston indicated that plaintiff was competent to manage his affairs, if not directly, then by directing the appropriate individual to do so. Dr. Kimberly Jackson at Rivertown Family Medicine has also provided ongoing medical treatment and care for plaintiff's closed head injury and other physical problems. On January 21, 2004, Dr. Julian N. Hayes at Strand Regional Specialty Associates performed an initial evaluation of plaintiff for seizures. Plaintiff's seizures are currently controlled by medication.
29. On June 12, 2006, plaintiff underwent an independent medical examination by Dr. Rudolph J. Maier, who is board-certified in psychiatry and neurology. Prior to the evaluation, Dr. Maier reviewed plaintiff's stipulated medical records. Dr. Maier performed a physical examination of plaintiff and interviewed both plaintiff and his wife. Dr. Maier noted that plaintiff has ataxia, gait disturbance of the lower extremities, and vestibular and probably cerebellar disturbances, which are post-traumatic. Plaintiff's deafness, specifically in the left ear, *Page 11 
is due to the closed-head injury. As a result of the compensable injury, plaintiff sustained permanent injury to the brain. Dr. Maier found that plaintiff had reached maximum medical improvement and assigned a 63% permanent partial disability to both legs based on plaintiff's gait disturbance. In addition, Dr. Maier opined that plaintiff sustained at least a 1% loss of or permanent injury to the face as a result of his mild aphasia and mild left facial palsy. With regard to his ability to return to work, Dr. Maier determined that plaintiff would likely be able to function at the sedentary level for two to four hours per day.
30. Dr. Maier opined to a reasonable degree of medical certainty, and the Full Commission finds, that plaintiff suffered a severe head injury, fractures, contusions, seizures and permanent damage to his legs as a result of the October 22, 2000 injury by accident. In addition, all of the various medical treatment plaintiff received following his October 22, 2000 injury by accident was reasonable and necessary to effect a cure, give relief, or lessen the period of plaintiff's disability.
31. On June 16, 2006, plaintiff reached maximum medical improvement. Plaintiff has not worked and has been disabled from any employment since October 22, 2000, the date of his compensable injury by accident and continuing to the present. Based on plaintiff's education, work experience, and permanent work restrictions, it would be futile for plaintiff to attempt to obtain suitable employment. Defendants offered no evidence that there was work available in the local labor market that plaintiff could obtain since plaintiff was released to return to sedentary work for two to four hours per day, either with defendant-employer or some other employer.
32. Defendants are entitled to a credit for long-term disability benefits paid to plaintiff beginning October 22, 2000, unless plaintiff repaid the benefits to the disability insurer. *Page 12 
33. Plaintiff's average weekly wage is $ 1,068.75, entitling him to the maximum compensation rate for 2000 of $ 588.00 per week.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. To be compensable under the Act, an injury must arise out and in the course of the employment. N.C. Gen. Stat. § 97-2(6). Generally, an injury suffered by an employee while going to or returning from his employer's premises where he is to begin his work does not arise out of and in the course of his employment. Bray v. W. H. Weatherly Co.,203 N.C. 160, 165, 165 S.E. 332 (1932). However, the "coming and going" rule is subject to some exceptions. Two of the exceptions to the general rule are the "traveling salesman" and the "contractual duty" exceptions.Hunt v. Tender Loving Care Home Care Agency, Inc., 153 N.C. App. 266,269-70, 569 S.E.2d 675, 678-79 (2002).
2. An employee whose work entails travel away from the employer's premises is within the course of his employment continuously during such travel, except when there is a distinct departure for a personal errand.Cauble v. Soft-Play, Inc., 124 N.C. App. 526, 477 S.E.2d 678, disc.review denied, 345 N.C. 751, 485 S.E.2d 49 (1997); Chandler v. NelloTeer Co., 53 N.C.App. 766, 281 S.E.2d 718 (1981); Martin v. GeorgiaPacific Corp., 5 N.C. App. 37, 41, 167 S.E.2d 790, 793 (1969). Defendants' construction project in Winton, North Carolina, required plaintiff to find lodging for the duration of the construction project because his permanent home was too far away for a daily commute. Plaintiff sustained injuries on his route from his temporary residence to his job at the prison construction project. There was no *Page 13 
evidence that plaintiff departed on a personal errand to take his travel outside the course of employment. Therefore, as a traveling employee, plaintiff was in the course of his employment while driving to the construction project on October 22, 2000 and his injuries were due to risks associated with his employment. Roberts v. Burlington Indus.,Inc., 321 N.C. 350, 364 S.E.2d 417 (1988); Ramsey v. Southern Indus.Contractors, Inc., ___ N.C. App. ___, 630 S.E.2d 681, disc. reviewdenied, ___ N.C. ___, 639 S.E.2d 652 (2006).
3. The "contractual duty" exception also applies to the facts of this case. In Puett v. Bahnson Co., 231 N.C. 711, 58 S.E.2d 633 (1950), the employee was hired to install an air conditioning system in a cotton mill that was 15 or 20 miles from his home. The employer paid the employee an additional $ 20.80 per week to cover his living expenses and the expenses of traveling to and from the place of employment. The Court held that when the employer provides transportation or provides compensation to cover the cost of transportation, injuries sustained while going or returning from work are compensable. Id. at 634,58 S.E.2d at 713. In Williams v. Brunswick County Board of Education,1 N.C. App. 89, 160 S.E.2d 102 (1968), a county superintendent was killed in an automobile accident while driving home in his personal vehicle. The evidence showed that the deceased superintendent was paid a $ 75.00 per month allowance for his travel expenses to and from work. Because the employee was required to work late hours as part of his duties, along with the fact that he received a travel allowance for driving his personal vehicle, the Court held that his accident arose out of his employment. Id. at 93, 160 S.E.2d at 105.
4. In the case at bar, defendants provided allowances to cover the cost of plaintiff's transportation to and from work in the form of a monthly per diem. Defendants paid plaintiff an allowance of $ 875.00 per month to cover the expenses of lodging, meals, and transportation. *Page 14 
Plaintiff provided his own personal vehicle, but used the per diem allowance to cover the expense of fueling his vehicle for the daily commutes to and from the construction project. As a result, plaintiff's injury by accident also falls under the "contractual duty" exception to the "coming and going rule." Thus, on October 22, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6); Puett v.Bahnson Co., supra; Williams v. Brunswick County Board of Education,supra.
5. As a result of his compensable injury by accident, plaintiff has been unable to earn his prior wages in the same or any other employment, and has been totally disabled from all employment since October 22, 2000. Specifically, plaintiff has demonstrated through the medical evidence that he was totally disabled during the period of his hospitalization and has demonstrated that given his physical and vocational limitations, it is presently futile for plaintiff to attempt to obtain suitable employment. N.C. Gen. Stat. § 97-29; Russell v. LowesProd. Dist., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
6. Plaintiff's showing of his disability creates a presumption of continuing disability and defendants have failed to prove that plaintiff is capable of securing suitable employment. Defendants, therefore, have failed to rebut this presumption. Saums v. Raleigh CommunityHospital, 346 N.C. 760, 487 S.E.2D 746 (1997), citing Kennedy v. DukeUniv. Med. Center, 101 N.C. App. 24, 398 S.E.2D 677 (1990).
7. As a result of plaintiff's injury by accident, plaintiff is entitled to total disability compensation at the rate of $ 588.00 per week beginning October 22, 2000 and continuing until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of *Page 15 
his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
9. As a result of his compensable injury, plaintiff sustained 63% permanent partial disability to both legs. N.C. Gen. Stat. § 97-31(15).
10. N.C. Gen. Stat. §§ 97-29 and 97-31 are alternate sources of compensation for an employee who suffers a disabling injury, which is also included as a scheduled injury. Plaintiff may elect the more munificent remedy available.
11. Defendants are entitled to a credit against compensation benefits owed to plaintiff for any long-term disability payments made from a fully employer-funded plan that have not been repaid by plaintiff to the long-term disability insurer. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fees approved below, defendants shall pay plaintiff total disability compensation at the rate of $ 588.00 per week beginning October 22, 2000 and continuing until further order of the Industrial. Any amount that has accrued shall be paid in a lump sum.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's *Page 16 
period of disability. The issue of whether plaintiff is entitled to an award for attendant care is reserved for future determination.
3. Defendants shall receive a credit for any long-term benefits paid to plaintiff beginning October 22, 2000 that have not been repaid by plaintiff to the long-term disability insurer.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: 25% of the accrued compensation due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. For the balance of the attorney's fees, defendants shall send every fourth check to plaintiff's counsel.
5. Defendants shall pay the costs.
This 3rd day of May, 2007.
 S/_________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING: S/______________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1